Good morning, Your Honors. Amanda Mundell on behalf of the United States. Just before I begin, I'd like to reserve three minutes for rebuttal. I'll try to keep an eye on my to board a flight with a kilogram of fentanyl and two kilograms of heroin that had been wrapped in layers of dryer sheets and plastic. The District Court's order suppressing these drugs should be reversed for either of two reasons. First, because the administrative search doctrine permitted a warrantless search of Green's suitcase to rule out any safety threat that may have posed to airport personnel and travelers. And second, because the single purpose container exception to the warrant requirement applies. I'll stop you there, because you're hitting right on my first question. In the District Court, you had five arguments, so the District Court receives you to have five. That's right. So you've expressly waived in a footnote that the true narc was not a search, right? And you've expressly waived that exigent circumstances exception. That's right. We're not pursuing either of those on appeal, Your Honor. And my question is, you just identified two. Okay, so that leaves one. You've expressly waived two, you've identified two that you're continuing to pursue. What about the good faith exception? We're not pursuing that either on appeal, Your Honor. Okay. All right. That answers that. All right, so we're going to talk first about the administrative search exception? Exactly right. So turning to that issue, I want to be clear, because there's maybe been some confusion in the briefing, so I want to make sure we're clear on what the government's position is and is not. It is not the government's position that any time there's any suspicion of any kind of narcotic, the government can go ahead and do— So what is your—your time is limited. What is your position exactly? So here, given what we know about LAX and the rise in fentanyl trafficking, government's position here is where there's a reason to suspect that these packages pose a safety threat, because there's a reason to believe they might contain fentanyl. Officers can search those packages and tell that threat away. Okay. I don't mean to interrupt you, but I get it. All right, so here's the question. That's what your briefing says. Your briefing says the safety—first of all, you're assuming that we've gone that far, that a safety threat for an airport administrative search may include other kinds of safety threats, not just weapons and explosives. And I think that's correct, Your Honor. Is that a yes? Yes. Okay. I don't think we've ever said that. But—so that's the first part of the problem I've got with your argument. I'm not sure it's a problem. We do have language in our McCartney case that talks about—there's sort of that clause at the end, right? And other dangers, other safety hazards. So let's—for a minute, let's say we extend that today to fentanyl. We haven't done that. I'll tell you, in my view, we haven't. But what we could—and fentanyl, certainly, we take it very seriously. So I understand that part of your argument. But then it seems like you run right into the findings of fact that the district court made, which is that, first of all, he thought that this argument that a tiny bit of incidental exposure has been very thoroughly discredited. And, you know, he's said that in his order. But he also—I'm more concerned about his finding of fact that this fentanyl, which is a very serious substance, was sealed completely in these three containers. So what about that factual finding? We can see those photos as well as he can. That's right, Your Honor. And I guess I would point this court to this court's decision in Miller, which is a perfect example of a circumstance where a suitcase is on a conveyor belt going through security, gets caught in the attempt to dislodge it, spontaneously reverts open, and out pops a bag of white powder. That's not what happened here. That's not even close. It's not what happened here, Your Honor, because TSA agents were able to secure that suitcase in a secure location. They pulled that suitcase— Right. That's right. And so before the search, they're looking at these lumps, three of them, and they're sealed, and there's—I can't see any—more broadly, the district court found, as a matter of fact, there was no danger of this incidental exposure, even if I accepted that the administrative search exception goes as far as you want it to go, and even if we accept that—the first, I think, is three even ifs. Well, so let me take this factual finding. Right, Your Honor. So if I could take those even ifs maybe one at a time. Let's start with the suitcase sitting in Nuremberg in TSA custody. We agree. You know, at that point, the powder is in a safe place. It's not just going to spontaneously combust. But that's not really the question under the administrative search doctrine, because at this point, agents have to decide whether to put that suitcase on a plane. And to make that determination, they have to decide— They could also decide to go get a warrant. They certainly could decide that, Your Honor, but the administrative search doctrine doesn't require that. The whole point is that agents are making— It requires at least a safety hazard. That's right, Your Honor. And I think the officers on the ground here had a reasonable basis for making that determination. And with respect to the district court, I think the district court gets the question wrong. It's not a question about whether fentanyl objectively opposes the sort of safety hazard that the agents, you know, think they're handling. The question is, what do the agents believe on the ground? Well, that's why I expected what you were going to—I agree. And that's why I expected you were going to argue the good faith exception, that they were complying with this manual, the DEA directive, which I think has been pretty thoroughly discredited. But the guys on the ground level don't necessarily know that, and they have no reason to suspect any bad faith here. So it seemed to me when I was reading the briefs and understanding the way this played out, they were following direction. But that's not the argument the government is making here. No, Your Honor. And we're not pursuing a sort of Leon good faith exception here, although of course there is that language in OCAI that talks about good faith when it comes time to apply the administrative search. And that's the kind of good faith that we're really talking about here. And if I could just— Counsel, can I just— Please, please. So, I know there was no evidentiary hearing in this case. That's right, Your Honor. And typically, in a good faith context, there are evidentiary hearings. So I'm also trying to understand when you're talking about the conduct of the agents here, it seems to be sort of, oh, they acted, they're presumed to act consistent with regular protocols. That's effectively what you're saying. Well, that's true, Your Honor. And actually, no one contested that below. Ms. Green, for example, did not suggest that the officers were off hunting for narcotics in bad faith. And so the parties agreed that an evidentiary hearing just wasn't necessary on this record. And if I can direct the Court's attention to the Hine case by the Supreme Court, I think that helps answer some of these questions about whether the officers were really making a reasonable or an unreasonable mistake when it comes to figuring out whether these packages could pose a risk. Because that's really the question that we have to grapple with for this part of the Administrative Section. It's not just argument that they reasonably thought these packages posed a risk. Well, Your Honor, that reasonable belief was informed by a number of things, DEA policy at the time in 2020. They've simply been discredited. Respectfully, Your Honor, I don't know that that's true. Well, I'm surprised to see you citing the 2016 press release that's been taken down from the website. These are the District Court's observations. So, Your Honor, we cite that, of course, because that's in the record. And so, you know, that's what the District Court had in front of it. But there are other things in the record that post-date that, that also talk about. Wait a minute. I'm trying to be fair. I thought that what the District Court had in front of it also was the account that acknowledged that that had been taken down from DEA's website. Your Honor, I would have to check on that. I'm not positive. I do know that that is the ongoing guidance from DEA. That has not changed. So, if it's been taken down by the website, it's not because it's been retracted. Counsel, I have some questions about the single-purpose container. Certainly, Your Honor. So, the government's view is that our case law does not say that we can't consider at all the knowledge and the experience of law enforcement. You know, Your Honor, I read this court's case law as not using that as a factor. So, the approach to the single-purpose container exception focuses on what a layperson would think applying societal norms. Now, there is that language that says that, I'm paraphrasing, but the experience of an officer can't be the sole basis for determining whether something contains contraband or not. But I don't read this court's cases to really focus at all on the officer's knowledge. It's more the layperson. But it's very suspicious. The package is certainly very suspicious looking. And I just realized I interrupted you. Please, go right ahead. So, you're familiar with our case law on looking at videos that the district court looked at, right? Right. And here, the parties decided no evidentiary hearing. So, we can look at the photos, too. That's correct. And we can also look at what the district court said about the photos, vis-a-vis how obvious to a layperson, based on the photos, the clear nature of this package would be. What standard of review does the government say we're looking at? Do we use the video standard of review? Do we use a normal clear error standard of review? Or is it somewhere in the middle? What's the government's view of that? Not clear error, Your Honor, because we're in the same position, essentially, as the district court. So, we would say they know we'll review. You can look at the photos and make a determination there. And I think there's something very significant about what those photos show, and it's the use of the dryer sheets to encase these substances within these packages. Let me just interrupt you one more time. So, let's assume hypothetically that we were to agree with you that once the officer, from the perspective of the layperson, saw what he had the right to see at that point, that its contents were completely obvious, and that it was completely obvious that this was narcotics. Under the single-purpose container exception, does that immediately give them the right to seize it and do whatever they want with it? I believe so, Your Honor. That's a compound question. Well, they can seize it. Yes. Right. Are you answering that they could also test it, search it? Well, it's in plain view at that point. So, the district court thought otherwise, and I think this is an important thing to hone in on. The district court cited in his footnote 11. So, what I'm going to do is, let's do this hypothetical. I think this is an airport administrative search. And that, up until the time they decided it's not explosives, I don't think it's even contested, that they can open the suitcase and take out the clothing and take out the lumps and all, right? Right. And then at 5.15 in the morning, they decided it's not explosives or weapons. Correct. So, at that point, I think our case law makes it really tough for the government, because at that point, the officers are very candid. They're looking for narcotics. They're investigating criminal activity. I think your stronger argument is the single-purpose container exception. And Judge Bennett's asking a question on this compound, and I think you're answering without maybe slicing them up. So, if we look at, as Judge Bennett asked you to do, we look at these photos, and we're in just as good a position as the trial court, because there's no evidentiary hearing, and you ask us to use de novo review, and let's say we look at these and we say, what do you want us to say? They recognize that as single-purpose, they have to announce their content. Exactly. Okay. And you think they've announced their content because they've gotten prior sheets? That's a big factor, Your Honor, yes. If all of that's right, and I'm going to have some pushback on that, because I want to – then Judge Bennett has asked you, they can seize it and do whatever they want. Seize it and search it. Right. I mean, the drugs are there. What about the – well, they didn't. They actually – when you say the drugs are there, if they'd truly been in plain view, the officers wouldn't have had to do any searching. But, in fact, they did the true narc search, and you conceded that argument. We talked about that at the top of the hour. You conceded that they did a search. That's right, Your Honor. We're not contesting that. And that's to confirm what kind of narcotic is inside those packages. Okay. So that's the problem I've got, because I understand the single-purpose container exception to be that no search is required. They really announce their content, but it seems to me there's these dryer sheets, and the officers were indeed searching because they didn't know what was in there. Well, Your Honor, they didn't know exactly what kind of narcotic was in there. Well, they didn't know that it was a narcotic. Not until they did the true search, and you've conceded that was a search. True, Mark. And you've conceded that was a search. So that's my first problem. Well, so, Your Honor, again, under the single-purpose container exception, if we accept that those packages proclaim their contents, we're already accepting that those packages convey to anyone looking at it that they contain drugs. Okay, so I'm going to give you that, right? And then the true narc just becomes irrelevant. You're right, exactly. So let's think, and now I think sequentially you're up to Judge Bennett's question, and his question really goes to they conceded, because your position is that any layperson would know those are narcotics, I guess, and seize and search, but the disregarded footnote 11 cites authorities for why he thought those are two different things, seizing and searching. What about those authorities? So that's certainly true, and I'm just getting to footnote 11 here just to make sure I've got it in front of me. It's certainly true that there's a difference between just seizing and searching. We all know this. But, of course, this is part of, you know, we haven't, because we haven't contested that the true narc scan itself is a search, we haven't really, you know, needed to wade into any of that, because if we accept that the officers can keep that package, you know, they know it's drugs just looking at it and retain it. That was enough to get the arrest warrant here. And they, you know, went ahead and just scanned it to confirm. So, counsel, I think you said this once, and I just want to make sure I understand this. The government's position, and it seems like a logical position to me, is that this is just one normal variant of plain view. Exactly. And it's the same as if it's in the back of a car and you seize it. You get to take it, hold it for trial, send it to the DEA lab, because obviously when you go to trial you need a lab examination or you're in somebody's house where you have the right to be and you see a package that's labeled cocaine on the table. You get to take it and then do whatever you want with it. And the government's position is it's exactly the same as any other variant of plain view. That's right. So that's why we don't have to worry about the use of the TrueNarc scan at that point. You do have to worry about distinguishing these citations in footnote 11. So just put a pin in that if you would. But I think you've answered that line. I think I want to make sure Judge Katzman has it, too. I'm glad. I just wanted to thank you. To be clear in my own mind, sort of, are there cases for what's your home run case? Suggesting that a container wrapped in dryer sheets has signaled a singular purpose of narcotics. Oh, Your Honor, we cite the Eighth Circuit that has recognized the widespread use of dryer sheets to conceal the smell of narcotics. And I think that court, and I'm forgetting the pin site, but I think it's in the fourth footnote, cites a number of other courts. The Ninth Circuit has not said that. Yeah, I'm not aware of any decision from the Ninth Circuit on dryer sheets. But, of course, I think it's significant here. Ms. Green doesn't grapple with dryer sheets at all. The district court didn't grapple with dryer sheets at all. And I think if we just take a step back and ask ourselves, you know, what would the layperson think, seeing a package with contents wrapped in dryer sheets, no one packages anything innocent in that manner. Are there any courts that have gone the other way on the dryer sheet question? Not that I'm aware of, Your Honor. We have case law, kind of goofy case law, it seems to me. These fact patterns are amazing. So cases are coming out, and, you know, drugs flying out of them. One of them is a case that you've read, and you cited here, with sort of a baggie of white substance, and then it's ripped, and there's white powder coming out of it, and they test it, and that's negative, as you know. And then the officer pokes his finger in there and finds a little container, another little glass container, and that did have cocaine in it. That's right. Right. So people do all kinds of things to hide narcotics, for sure. I'm trying to figure out, given all the different circumstances that we've got, where white powder turned out not to be cocaine, what do we do with this? I'm trying to set aside that they didn't have, and they couldn't still have doubt that's why they did the true narc. So I'm trying to set that aside. You want me to decide that? I want us to decide that these contents right here that we're looking at proclaimed there that it was narcotics. That's right. Underneath those dryer sheets. They certainly had ample probable cause to, right? Certainly reasonable suspicion, for sure. They could have gone to get a warrant. They didn't. And you think, what's your strongest argument, that they didn't have to? That this could only be cocaine or fentanyl. It doesn't have to just only be fentanyl. It has to proclaim its contents to be contraband. It doesn't have to be that only fentanyl could have fit into these packages. But that is just clear from societal norms. Of course, there's no case that's exactly on point here. It's sort of an unusual circumstance. It could be fentanyl. It could be heroin. It could be cocaine. Exactly right. But nobody, if we just run through the list of even examples that Ms. Green has offered, cricket powder, flour, baking soda, even personal makeup powder, anything like that, no one puts that in plastic wrap and dryer sheets and then vacuum seals it and packages it amid clothing items that don't belong to the person. There's so many circumstances here. I think this is your stronger argument. But I'm still looking at the authorities at footnote 11. The government didn't convince the district court. He's got these authorities. Law enforcement's authority to seize a suspect's effects is distinct from the authority to search those effects. That's Walter. And we most recently said this in United States v. Young in 2009. Even when the government agents may lawfully seize a package to prevent loss or destruction of suspected contraband, the Fourth Amendment requires that they obtain a warrant before examining the contents of such a package. Have we more recently said something different? You know, Your Honor, I'm not aware. I would have to check. I don't think so. But I think this doesn't have to come into play because of the single-purpose container exception. So all of those, you know, the need to obtain a warrant before examining the contents only matters if the contents never proclaimed their contents in a way that the single-purpose. These cases don't deal with plain view. Exactly. Exactly right. And I've heard that plain view is its own, you don't need a warrant because it's plain view. And if it's not in plain view, then you need something else. Precisely, Your Honor. And so to get to plain view, we have to decide the true NARC surge, which you've conceded was a surge, was something that was just perfluous. Exactly. It's like a laboratory test in that sense. We know that it's drugs. Let's now confirm exactly which kind of drug it is. Thank you. That's clarifying. Judge Markelton. So just for my own thinking, so what you're saying, and correct me if I'm wrong, is that this case differs from the cases involving nondescript packaging of drugs. Certainly, Your Honor. And so, I mean, just to look at, I think, Miller as an example with that package of white powder, which we know tested innocuously, it's not clear that, you know, a white powder that encases another, you know, container, automatically proclaims that whatever is in that inner chamber must be drugs. That's just not clear to a layperson. It's not clear under, you know, societal norms. But here we have something quite different. I mean, Miller is one of the cases cited in this footnote. Isn't that even more suspicious? There's a baggie with white powder spilling out of it. They test that. That's suspicious enough that they test that. And then there's another thing secreted within there. It seems to me to be even more suspicious than Miller. I'm just trying to get to consistency here. Miller says they needed a warrant. Doesn't it? That's right. Miller says that the test of that inner chamber, I think it was a fiberglass container, they had to get a warrant to test that. Because that didn't proclaim its content. Exactly. And I think that's a different circumstance than what we have here, where, you know, in Miller, you already have one test that confirms that at least part of that package is totally innocuous. Here, nothing about this package suggests it's innocent. I mean, again, just to bring it back to societal norms, no one packages anything innocent in layers of dryer sheets and plastic wraps. They just don't. And so what the officers can see on the ground in front of them seems to proclaim its contents quite clearly. Those are drugs. And I don't know if that answered your question, Your Honor. More questions? No. I think it's very helpful. Thank you. Thank you. You actually saved the amount of time you thought we were going to save. It almost never happens. Congratulations. We'll hear from our opposing counsel. Good morning, Your Honor. So may it please the Court, Caroline Platt on behalf of Melina Green. I'm happy to start with the single-purpose container exception rather than. . . Could I just back up? Sure. I think it's uncontested that this was an airport administrative search up until the time. That's why they could open the suitcase, right? And move the clothes over. And is that. . . Am I right about that? Yeah, it's checked luggage. And the TSA is, you know, obviously allowed to screen checked luggage. And I'd like actually to clarify the timeline here. Up until 5.15 a.m. the TSA had Ms. Green's luggage. And I think, you know, there's been some lack of clarity at times about which agencies were doing what. Until 5.15 a.m. the TSA was looking at Ms. Green's luggage. They did scans for explosives and weapons and deemed them to be negative. There were no explosives. There were no weapons. And that's all part of it valid. . . And that is all valid. . . Uncontested. Uncontested airport administrative searches. They suspected that these non-weapons and explosive masses inside the smaller ones, inside the larger ones, all wrapped in various layers of clothing and other stuff, were something else. Suspected maybe with reasonable suspicion or some level of suspicion of narcotics. This is one fact I'd like to make clear. They never knew that it was fentanyl. It was an unknown powder that was drugs, any kind of drug, cocaine, ecstasy, speed, heroin, whatever. They called the LAXPD. LAXPD came and at the top of their report it says, narcotics investigation in terms of an illegal programmatic purpose. We have well moved beyond the airport administrative exception. I want to clarify on your position, and I think you state this explicitly, that when we get to the relevant time, and I know I interrupted you in talking at the time frame, when we get to the relevant time, there are only two things that qualify basically explosives. So I think what we said I think pretty clearly in our brief, Your Honor, from United States v. Davis on for the past I think now 50 years, what this court has had to say so far, and this again is checked luggage. This is not carry-on luggage, and that's what I think is an important distinction. In your checked luggage, it's weapons, explosives, or things that can be used to hijack an airplane. What about ricin? I'm not that familiar with ricin, Your Honor, because it hasn't come up in this case, but I think so that would I think count as a weapon. No, a poison. So it's not a firearm. It's not an explosive. What about if they think that there's a poison? A weapon, right? I mean, it would be an airborne. I think those would fall under weapons, Your Honor. Or if a substance were used. Sure, but again, this is checked luggage, so these are, sorry, Your Honor. I guess I'm asking a clarifying question. Oh, my golly. If we're positing a powder that if there's incidental exposure, it could be used as a weapon, is that the hypothetical? Not so much as a weapon. You're taking it to somewhere else where you want to sell it or something, but if it gets out, it could kill everybody on the plane. I think, Your Honor, that's why I'm thinking of it as a weaponized substance of mass destruction. And, you know, I mean, like having, as I think we all did live through that era, or living through that era, I think, and I'm hoping that the Homeland Security TSA Department, when they did their swabs, which they did here of the luggage, I'm hoping that that's the kind of thing they're swabbing for, cocaine, heroin, fentanyl. That would be permissible. And that would be permissible, exactly. But if there's, like, a giant bag that's labeled fentanyl. I think that would fall under the single-purpose container exception. I'm just talking about under the administrative search. Under the administrative search, a bag with a couple of holes in it that's labeled fentanyl, it's right out because our case law stops at explosive and weapons. Again, Your Honor, I think, if I can answer that question, I think that would fall under the plain view exception, but would not be a purpose of the airport administrative search exception. But that's what I'm saying, that giant bag labeled fentanyl, holes in it, doesn't count under administrative search. Correct, but would have been plain view discovered by the agency. And if they saw it. If it had holes in it, I wouldn't have qualified. I mean, specifically fentanyl? I mean, a bag of cocaine with holes in it would not have the same danger as a bag of fentanyl. We're talking about fentanyl because there's this concern. Maybe this has been debunked, but just we're talking about the people in the field, if they thought it was fentanyl because I think the hypothetical labels it as fentanyl. Yes, high in fentanyl. It's a tricky hypothetical. And it has holes in the bag. Sure, I think at that point they could take whatever safety measures they want to protect both themselves and anyone in the vicinity. I think they've already been doing an administrative search. I think the safety measures at that point are part of standard public building safety measures in any public building. What's the exception there that gets you around the Fourth Amendment? Well, they're already doing an administrative search. The safety measures are standard safety measures of any public building. That's not a Fourth Amendment issue, Your Honor. That's a public safety. So there's no reasonable expectation of privacy. Is that it? No, I think the search they were already doing is the administrative search. But you used a few minutes ago the term plain view, too. Yes. So at that point, if it's in plain view, is it fentanyl that they can take it and do whatever they want with it and send it to the DEA lab? I think the plain view answer is separate from a reasonable expectation of privacy analysis, Your Honor. But I stand by that answer. If you find a bag that says, hi, I am fentanyl, that falls under the plain view exception as well. You can just take it and search it. You can take it. You can't search it? I would like to stand by footnote 11 of the district court's opinion as to the search question of the plain view exception. So your view is that even if plain view in any circumstance allows you to seize it, then you need a warrant to send it to the DEA lab? Yes, I do, actually. And so I really would like to discuss the plain view exception, and I have some answers to the questions you all are asking, my friend. A single-purpose container. I do. A variation of plain view. Correct. I think that the government has erred with regard to the standard of review of the district court's finding as to the single-purpose container aspect of the plain view doctrine, and I think that's critically important. I don't know, because there wasn't an evidentiary. Correct. I mean, you have a lot of these usually in the 1983 context where there's a video on the wall, and we say usually we're looking at a finding of fact, and we look for this. We have this very, very direct standard of review, and we can see the evidence as well as the district court. What's the answer? So here's the answer to that, Your Honor, in my opinion, and with citations. The video review by the Court of Appeals comes from the Supreme Court's case of Scott v. Harris, that this court can view video just as well as a district court sitting as a finder of fact. Under this court's decisions under this specific single-purpose container aspect of the plain view doctrine, in United States v. Gust, which is from 2004, and also United States v. Miller, this court reviews findings of fact under the single-purpose container exception for clear error. Right, but both those cases predate this other, more recent innovation where we have video footage we can see. Well, there's no video footage in this case, Your Honor. I know. So that's why I don't think that DeNovo and Vigo. I'm trying to find a principal distinction. I think it's video versus photos. Well, but I go back to Judge Bennett who first raised this. I think it was. Why is that a principal distinction? So I think it's because video is moving and is much more clear than photos. Here's the other thing I would like to say, and I would ask you to just, regardless of the standard of review, I think we win this issue, and here's why. The dryer sheets in this case are not visible. There is opaque plastic, and on page ER21 of the district court's. But they're not identifiable as dryer sheets. I can see them. What do you mean they're not visible? I don't think they're identifiable as dryer sheets. I think there's just opaque plastic. ER21, the packages did not reveal their contents. The government asked the district court to find that you could see through the plastic, and the district court defined that as a finding of fact. And, again, under Gust and under Miller, findings of fact are reviewed only for clear error. So even if this court is convinced that it would have decided the issue differently under a clear error standard of review and under United States v. Ornelas, which is also, as you know, a Supreme Court decision about suppression hearing standards of review, specifically in the Fourth Amendment context, we would ask this court to defer to Judge Olkin's very careful findings of fact. And Ornelas did not require an evidentiary hearing to take place. It relied on district courts being members of the community. The correct review is that whatever our law is on video does not apply to photos. Correct. And that, again, is video. Is there any case that says that? Scott v. Harris is the origin of the video exception. But is there any case that says our video law doesn't apply to photos? No, but it has only been applied to videos, Your Honor. And, again, the origin of that is Scott v. Harris and is specific to videos. Are you aware of any case that doesn't apply it to photos? I am not, Your Honor. But, again, there's multiple cases applying it, applying the clear error standard over video to factual findings to this exception. There's not one that we can find thus far that puts these different principles together. So. Is this usual rule we would apply for a finding of fact? Yes. We have a situation here where we certainly have a finding of fact and no evidentiary hearing. So there's not going to be any of this deference to the demeanor of the witnesses or anything like that, right? Correct. Not the demeanor of the witnesses in speaking. But the other thing I would say about the dryer sheets, Your Honor, is that if you look at the actual police reports of all the various agencies in this case, the dryer sheets are never mentioned at the time of the investigation. So, as I said, there was a narcotics investigation, a drug investigation, by both the LAXPD and the DEA, which is, of course, the Drug Enforcement Administration. They were doing a narcotics investigation into an unknown drug. The dryer sheets were never mentioned until the affidavit submitted with the opposition to the motion to suppress by the U.S. Attorney's Office. It's the affidavit that says they were vacuum sealed with multiple layers of packaging, including visible tear gas. At the time of litigation. Whoa. So, wait. So, I'm not sure I know what you mean. I think you mean that the record, if we put the record in order of chronology in which the documents were created, nobody's mentioning that they sought dryer sheets. Is that what you mean? Or that they relied on them. I'm sorry. Until we get to the declaration that was executed sometimes later. During the federal court litigation of the motion to suppress. All right. So, there's no, so they weren't necessarily relying on them in real time. And the district court declined to put any weight on that, even though the government asked it to during its final attack. Or they put weight on what? The dryer sheets. And so, it, you know. Wait a minute. Is that, does he ever say, I'm aware of that, but you're, I know we're slicing this very fine, but sometimes these cases come down to really small questions. So, I can see these dryer sheets. I can see white things through the plastic that is see-through. Okay. At least part of the packing bag was see-through. Let me ask a preliminary question. These three lumps that we're looking at that are sealed, I'm understanding from the record that they were inside that clothing bag, part of which has a blue label that's not see-through. That's correct, Your Honor. Okay. But at least part of that blue label, part of the clothing bag does not have a blue label, and it looks to me like it is, indeed, transparent. Correct. So, the larger bags everyone gets are transparent. The defining effect of non-transparency is as to the three smaller bags. Right. So, but you're getting ahead of me. Go back to the, they're good with opening the suitcase, removing the clothing, and then I think they had to open the clothing bags, the sealed clothing bags, because the three white bags were inside it. But the clothing bag, the bottom half of it is blue, and it is not transparent. The top half seems to be transparent. That's what I'm asking. You mean the DEA at 7.45 a.m.? No. I think this would have been done earlier by the folks who come, the explosive specialists. So, my understanding is actually it was both, because. So, first of all. Yeah. My question was, these three white packages were inside the clothing bag. Yes. Correct. All right. And I think the clothing bag, the top half of it looks to be transparent. That's my understanding. And I'm concerned for the purpose of this question, who took them out? Yes. Okay. So, they could see through the clothing bag and see the white bags in there. Which, yes, which the district court found the little ones were not transparent. Right. Okay. So, now we've got the. But it seems to me all of that's going to be uncontested under the airport administrative exception. All of those searches to the point. Hold on. You're saying no, but you haven't heard my question yet. So, to the point, I think all of it is uncontested that the officers were able to do all of those openings, all of those searches to the point where they got the three white bags out. I do contest that, Your Honor. Okay. Here's why. I do not contest that the TSA could do all of that before 5.15 a.m. I contest that the DEA could do anything at 7.45 a.m. I don't think. Wait, wait, wait. Yes. So, when the DEA. So, we know that at 5.15 they've. They've cleared the bag. They've decided it's not explosives or weapons. Okay. Do you. Is it your understanding from the record that they put these three white bags back in? Yes. The DEA opened the suitcase altogether at 7.45 a.m. Everything was closed. Do you have a record site for that? ER-5. Okay. So, you think the DEA couldn't do anything at that point? I don't think they got a warrant. Okay. Go back to, let's assume that there's another place on the record that suggests that this, because I've asked my law clerk about this a couple of times, that this is ambiguous, about whether they had to, the DEA folks had to reopen that suitcase, or whether they found it looking like it looks in this photo. Of course, you've got several photos, but the ones where the three white lumps are sitting out on top of the blue clothing bag certainly aren't. Okay. If they were looking at that, the district court thought that a layperson wouldn't recognize that as something that had immediately announced its contents. Yes. And your best answer is you think that the white sheets, you said that, everybody can see the white sheets. You think they're not identifiable as laundry, dryer sheets? So I have several answers for that, Your Honor. One answer is, my first answer is a factual finding by the district court that those bags were not transparent. My second answer is, as Your Honor, the smaller bags, correct, the three smaller bags. Weren't transparent. And he found that they were not transparent, that they were not clear. The second answer being that the district court found that they did not reveal their contents. I think that that meant both as a layperson that they were not contraband, and second of all, as Your Honor was referring to, under this court's prior decisions in Miller and Gust, the white powder spilling out case, the green marijuana case, under this court's single purpose container doctrine exception law, there was nothing more inherently suspicious to a layperson as opposed to a DEH that proclaimed that these little packages necessarily were narcotics as opposed to any other kind of powder in the world. Under Miller and Gust. It doesn't use the word necessarily. Is that the test? Here's the test, Your Honor. I wrote it down because I think there's ways that people in the criminal justice industry, whether you're a lawyer or a judge or a DEH, would phrase it, but that's why I think it's important to look at the law. Under Gust at page 801, a container must so clearly announce its contents, whether by distinctive configuration, transparency, or otherwise, that its contents are obvious. So the standard is obvious to an observer. Because the counsel has argued nobody does this, nobody wraps anything other than drugs in dryer sheets and sealed plastic containers and puts them in their locker. My answer to that, Your Honor, is that a Department of Justice attorney or an AFPD or a judge or a DEH agent might think that, but what about if you're applying from California to Richmond or Virginia and you have some weird keto diet and you need some weird baking powder that you can only buy in Venice Beach? I mean, there are other powders you might want to travel with. It's obvious to a layperson is the standard from Gust. All right. So let's go back. With all due respect to vegan keto powder eaters. I haven't been raised on a cattle ranch. I'm just going with you on that. So let's go back to these. And just for the sake of a hypothetical, let's decide whether we think that we can borrow on this video case law. And we can see this as well. And with respect, we think a layperson would know that that's got narcotic substance in it. Maybe not what kind of narcotic substance. Is your next answer footnote 11? Yeah. I think my next answer would be footnote 11. You can seize it but not search it? Sure. Again, Your Honor, as referenced earlier, this bag was checked. Ms. Green was halfway across the country already on her flight. There was no case suggesting they had to give this back to Ms. Green, right? They could get a search warrant under either doctrine. The question is whether they had to. And you think these cases, what's your strongest case? Because these are old cases. Well, so Jacobson is not the strongest case. We all know that Jacobson only goes to tests that either give you cocaine versus not cocaine. This, I think, goes into the wave issue. So narc is a search because it gives you not just drug versus not drug. They conceded to good faith doctrine. They have, and I'd also like to note they conceded to good faith doctrine, so whether heroin or high end or all of those things. Well, the counsel has been really candid about that. Yes. So Miller is the case within the powder, right? And then I think we said this more recently in the United States versus Young, but do you know of other or more on point authority? Unfortunately, Your Honor, I don't. More analogous. Okay. All right. We've asked you a lot of extra questions. Please. Yes, Your Honor. So I want to make sure I understand you correctly about what the PEA agents saw when they got there. No, I have a question. Yes, sir. So I'm looking at paragraph 16 of Agent Tobias' affidavit, and he says task force officer Spears and I met with airport police at the narcotics task force office and observed two clear plastic vacuum sealable space saver bags that said room essentials inside an open suitcase with clothing. Doesn't that suggest that when he got there the suitcase was open? I think that's ambiguous, Your Honor. I mean, that he observed it doesn't mean that he didn't open the suitcase before he observed it. Okay. I mean, again, Your Honor, I'm relying on the district court's opinion, which is a finding of fact that the government has not challenged for clear error, and the government is the appellant here. Having not challenged that, that issue is waived. And on page ER5, sorry, I apologize, Your Honor. The government is the appellant. They have not challenged this, and we did raise it in our red brief. We noted in our red brief that on page ER5, the district court's opinion, it says, instead of seeking a search warrant, the DEA officers opened defendant's suitcase. That's a finding of fact by the district court. You answered my question. Thank you. And the government did not raise that as an issue. Thank you, Your Honor. I'm sorry. Did you have more questions? Just one question. And I know that we're bound, we looked at the Ninth Circuit jurisprudence. What is your reference, response to the Eighth Circuit jurisprudence? Can you be more specific? Right. And so far, is there a case law that goes the other way? Like on which issue, Your Honor? On the, you know, administrative search. Right, the administrative search. I am not familiar. I mean, I don't think that's been briefed, Your Honor. I'd be happy to submit a 28-day letter if you'd like me to. Okay. Well, we'll see. Thank you so much for your patience with our extra questions. Thank you, Your Honor. Okay. For opposing the motion. I think she saved about five minutes, actually. I did request three, just to be totally candid. But I think you had put three on the clock. I think I was over, Your Honor. Then we'll put three. As much as I'd love the extra time, there are a few things that I'd like to respond to. And, you know, I'd like to start with the single-purpose container exception. Although I do want to recognize, you know, there are some tricky issues on the administrative search issue. And we would push back on some of the suggestions that the administrative search doctrine at an airport is strictly limited to explosives or weapons. But I want to get to, you know, what Judge Christin made a strong point on that. Your other response. Exactly. So, you know, Judge Christin, you've noted that it's probably easier to resolve this case, perhaps, on the single-purpose container exception, because that is our strongest argument. And I think that's correct for a number of reasons. As we've been discussing, the use of these dryer sheets is significant here. And this, you know, Venice Beach keto diet theory just respectfully doesn't hold water, because no one puts anything innocent inside of layers of dryer sheets. And it's not an insulator. It's not like bubble wrap. It doesn't protect the contents. It's there for one reason and one reason only. Housing Council argues that these aren't necessarily identified as dryer sheets until after the fact, and that then that's when it gets memorialized in the declaration, so that it's not clear from the record that the officers, who I think everybody assumes are acting in good faith, that they could actually see and identify these white things as dryer sheets before the packages were opened. What's your best response to that? Well, Your Honor, it's true that there's no contemporaneous report from the TSA noting that these packages contain dryer sheets. What we have is the Tobias Declaration, and that declaration recounts what Agent Tobias saw when he observed the suitcases and observed the packages. And in that declaration, he says quite clearly that they contain visible dryer sheets, and that's before they sent the packages off to the lab. He says visible dryer sheets? Yes, I do believe that he says it's visible. And I can point you to that ER reference. I think that's ER 148. He says visible dryer sheets. Including, quote, visible dryer sheets, lines 17 and 18. So I think that... Okay, they are visible. Everybody can see them. The question is can you identify them as such? And so if you can, I don't want to be late with this one, but if you can smell it or touch it, there's that very unusual texture for a dryer sheet. But I've looked everywhere in the record, and I couldn't see if I missed any indication that these were actually, there was an odor. No, because they were within the packaging. No, no allegation. I mean, sometimes the dogs can smell it anyway. But I don't think there's anything that indicates that a canine was used or that there was any odor coming out of these three packages. That's correct. And nobody could touch them. Okay. That's right. And, you know, this court is in the same position as the district court to look at those photographs. And from my perspective, they seemed clear. The district court didn't really grapple with whether they were or were not dryer sheets. The court just didn't really address that factual issue at all. With respect to the other citations that opposing counsel has noted, the cases like Gust and Miller, I think we have a different circumstance here relative to Gust or Miller with respect to how obvious it is to someone that these packages contain contraband. These are simply not the same things as the guitar case in Gust or the other packaging in Miller. We have a very specific use, like I said, of the dryer sheets. And that should be given significant weight here. In Miller, it sounds like you're arguing that Miller cut in your favor because the outer substance was tested negative. So that seems to indicate that there would be a lessening of the suspicion about what was in the little plastic thing inside. It certainly didn't add to any suspicion. That's right. There's nothing obviously incriminating about that vial relative to the obvious incriminating nature of these dryer sheet-wrapped substances inside of these packages. I see I've now exceeded my rebuttal time. Is there any other questions from the court? I'm not necessarily willing to give you tons of advice. Do you have any questions? Just one unrelated question. And this goes back to the question of whether fentanyl is a hazardous safety, poses a hazard safety risk. Why hasn't there been sort of any sort of evidentiary hearing in other litigation that actually establishes, if not here, whether, you know, fentanyl poses that kind of risk? Your Honor, it may well be that that is coming or currently brewing. I am not aware of any case, but, of course, that might be possible. And I think in a given case, that may be appropriate. We may be headed in that direction. I would just note for the court that really the question here that the district court should have grappled with is whether the officers were making an unreasonable mistake with respect to that fact, whether fentanyl is dangerous, and whether these packages pose a safety threat. And in light of the number of judges who have recognized the dangers of airborne fentanyl, we cite two of those cases in our reply brief at pages 10 to 11. There's a third case out of the 11th Circuit that we cite that talks about fentanyl posing a danger if people come upon it in the public just sitting there. If they're completely sealed, that's the problem you've got, right? Now you're back to the administrative search section when you say whether the officers made a reasonable mistake, right? Right. Okay. And we had a hypothetical here of Judge Bennett about fentanyl, but in a bag that was leaking. Right. Different story. That is different. There's no indication that these were leaking. Not yet, Your Honor. And so I would point the court back to Miller. You know, just because a package is safe and sealed at the time that it goes through the conveyor belt doesn't mean it's safe and sealed when it comes off the other side. And stuff can happen on planes. Stuff can happen. And, you know, I know it poses a danger. No, but the hypothetical was they can seize it. The question is whether they have to go get a search warrant for it. I wasn't suggesting they put it back on the conveyor belt. Well, Your Honor, the alternative, of course, to not getting a search warrant at all is, the question they have to ask themselves is, is this safe? If we put this back on an airplane, is that going to be safe? That's not my hypothetical. My understanding is that once they were looking at these and really clearly suspected narcotics, you know, memorialized as much, not that they would put it back on the conveyor belt, but that they would go get a warrant. Well, Your Honor, the whole point of this PSA protocol that has been developed with LAX PD and DEA is to ensure that narcotics coming through LAX Airport both are identified, but also to make sure that they're not unsafe, that they don't pose a hazard to people and the traveling public. That's why there are all these protocols about handling these narcotics very carefully. Okay. How were these three bags going to pose a safety hazard if they remained in that safe where they were? Certainly, if they remained there for all time, then it's quite unlikely. All time? I was just suggesting long enough to get a warrant, which they got, and the district court found they had a 24-7 magistrate judge waiting to give it to them. Got it? Easily. That's right, Your Honor, but that doesn't actually address whether, respectfully, whether in that moment the agents are still permitted under the administrative search doctrine to make sure that those packages are safe or unsafe. And it's true that they can hold that and get a warrant, but they don't have to under the administrative search doctrine if there's a concern that they may pose a threat. And if you're right, then they have the ability under the administrative search doctrine to use the, what is it, TrueNarc? TrueNarc device, and that is really the safest way to test it. I'm not sure where your view of the law would end. I don't think that. Where does it end? You know, Your Honor, I don't think that's right. I think, you know, here we have two specific circumstances. We have the fact that there's a rise in fentanyl trafficking through LAX Airport, which may not be the case around the country. That gives the officers reason to believe that these packages may contain fentanyl. And the question is, I've given you the, I'm assuming this is a very dangerous substance, but where does it end if you're hypothesizing that these packages that are sealed and are sitting on the shelf and can stay there until we get a warrant, you're hypothesizing that something could happen where this could become friable and there could be incidental exposure. That's the part where I'm saying, wow, where does that end? Well, Your Honor, that only ends, you know, that's assuming that the bags are going to go back into the, you know, airport and back onto the plane. So, and I understand the court's point. The court's point is we've eliminated the threat of explosives or weapons. It doesn't look like it's going to spontaneously burst open, so just go ahead and get a warrant. I don't think the administrative search doctrine requires that. We thank you well over your time. I appreciate it, Your Honor. I appreciate both of the arguments of both counsel. Very helpful. Very important case. We'll take this under advisement and go on to the next case on the calendar.
judges: CHRISTEN, BENNETT, Katzmann